CASE NUMBER 24-10938-DD

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

United States,

Plaintiff-Appellee

v.

Hassan Jones,

Defendant-Appellant

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

DEFENDANT-APPELLANT'S BRIEF

Kristen Gartman Rogers
Southern District of Alabama
Federal Defenders Organization, Inc.
11 North Water Street, Suite 11290
Mobile, Alabama  36602
(251) 433-0910

Counsel for Defendant-Appellant

## CERTIFICATE OF INTERESTED PERSONS

United States,                           *

     Plaintiff-Appellee            *

                                No. 24-10938-DD

v.                                       *

Hassan Jones,                            *

     Defendant-Appellant           *

_____/

     I hereby certify that the following persons and organizations have an interest in the outcome of this case or appeal and that no publicly-traded company or corporation has an interest in the case:

1.    Hon. Jeffrey U. Beaverstock, United States District Judge

1.    Sean Costello, United States Attorney

2.    Colin Fitzpatrick, Assistant Federal Defender, trial counsel for Jones

3.    Scott Alan Gray, Assistant United States Attorney, counsel for the United States

4.    Hassan D. Jones, Defendant-Appellant

5.    Hon. Katherine P. Nelson, United States Magistrate Judge

6.    Kristen Gartman Rogers, Assistant Federal Defender, appellate counsel for Jones

7.    Justin David Roller, Assistant United States Attorney, trial counsel for the United States

8.    Jessica Terrill, Assistant United States Attorney, trial counsel for the United States

9.    Gina Vann, Assistant United States Attorney, trial counsel for the United States

## STATEMENT REGARDING ORAL ARGUMENT

The Defendant-Appellant requests oral argument and suggests that oral argument will aid the Court in resolving the issues raised in this appeal.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . . . . . . i

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . iii

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. Whether the district court erred in denying Mr. Jones's motion for judgment of acquittal on Count Three, which charged him with possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. 924(c), where there was insufficient evidence that the firearms were possessed in furtherance of the drug trafficking offenses. . 1

II. Whether Mr. Jones's convictions must be reversed because the district court abused its discretion when it permitted the government to introduce Mr. Jones's rap music videos, images, and lyrics at trial despite the probative value of the evidence being far outweighed by Rule 403 concerns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III. Whether Mr. Jones's convictions must be reversed because his Fifth Amendment rights were violated when the government's attorney and law enforcement witness commented on his post-*Miranda* silence during the government's case in chief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

IV. Whether Mr. Jones's convictions must be reversed because the prosecutor improperly quoted and relied on an exhibit that was not

admitted in evidence during the government's closing argument. . . . . . . 1

V. Whether the cumulative effect of multiple trial errors violated Mr. Jones's substantial rights and deprived him of a fair trial. . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. Course of Proceedings & Disposition in Court Below . . . . . . . . . . . . 3

II. Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

A. Motion to Exclude Artistic-Production Evidence . . . . . . . . . . 5

B. Jury Selection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

C. Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

1. The traffic stop . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

2. The search warrant execution . . . . . . . . . . . . . . . . . . . . . 11

D. Motions, Closings, Jury Instructions & Verdict . . . . . . . . . . . 19

E. Presentence Report & Sentencing . . . . . . . . . . . . . . . . . . . . . . 21

III. Standards of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ARGUMENT AND CITATIONS OF AUTHORITY . . . . . . . . . . . . . . . . . . 25

I. The district court erred in denying Mr. Jones's motion for judgment of acquittal on Count Three, possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. 924(c), because there was insufficient evidence that the firearms were possessed in furtherance of the drug trafficking offenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

II. The district court abused its discretion when it permitted the government to introduce Mr. Jones's rap music videos, images, and lyrics

iv

at trial because the probative value of the evidence was far outweighed by Rule 403 concerns.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    A. Background: Rap Music as Artform  . . . . . . . . . . . . . . . . . . . . . 30

    B. The Admissibility of Rap Music in Criminal Trials  . . . . . . . . 31

    C. The evidence should not have been admitted in this case.  . . . 33

III. The government violated Mr. Jones's Fifth Amendment rights and tainted the convictions when the prosecutor and a government law enforcement witness commented on Mr. Jones's post-*Miranda* silence in front of the jury during the government's case in chief.  . . . . . . . . . . . . 39

IV. The prosecutor improperly quoted and relied on an exhibit that was not admitted in evidence during the government's closing argument.  . 44

V. The cumulative effect of the trial errors affected Mr. Jones's substantial rights and deprived him of a fair trial.  . . . . . . . . . . . . . . . . . . . . . . . . . . 47

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

## **TABLE OF AUTHORITIES**

<u>Cases</u>:

Batson v. Kentucky, 476 U.S. 79 (1986)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) . . . . . . . . . . . . 41, 47

Doyle v. Ohio, 426 U.S. 610 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39-41, 44

Greer v. Miller, 483 U.S. 756 (1987)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 44

Herring v. New York, 422 U.S. 853 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Hill v. Turpin, 135 F.3d 1411 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Kotteakos v. United States, 328 U.S. 750 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . 38

Luke Records, Inc. v. Navarro, 960 F.2d 134 (11th Cir. 1992) . . . . . . . . . . . . . . 30

Miranda v. Arizona, 384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . 1, 13, 24, 39-44, 47

New York Times v. Sullivan, 376 U.S. 254 (1964) . . . . . . . . . . . . . . . . . . . . . . . . 38

Old Chief v. United States, 519 U.S. 172 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Rehaif v. United States, 139 S. Ct. 2191 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Tann v. United States, 127 A.3d 400 (D.C. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . 31

United States v. Baker, 432 F.3d 1189 (11th Cir. 2005) . . . . . . . . . . . . . . . . . 23, 48

United United States v. Belfast, 611 F.3d 783 (11th Cir. 2010) . . . . . . . . . . . 33, 35

United States v. Dasinger, 650 Fed. Appx. 664 (11th Cir. 2016) . . . . . . . . . . . 27

United States v. Dixon, 901 F.3d 1322 (11th Cir. 2018) . . . . . . . . . . . . . . . . . . . 28

United States v. Dortch, 696 F.3d 1104 (11th Cir. 2012) . . . . . . . . . . . . . . . 43, 46

United States v. Edwards, 576 F.2d 1152 (5th Cir. 1978) . . . . . . . . . . . . . . . . . 40

United States v. Frye, 402 F.3d 1123 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . 26

United States v. Gamory, 635 F.3d 480 (11th Cir. 2011) . . . . . . . . . . 32, 33, 37, 38

United States v. Hands, 184 F.3d 1322 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . 48

United States v. Hawkins, 934 F.3d 1251 (11th Cir. 2019) . . . . . . . . . . . . . . 22, 23

United States v. Herberman, 583 F.2d 222 (5th Cir. 1978) . . . . . . . . . . . . . . 47, 48

United States v. Isnadin, 742 F.3d 1278 (11th Cir. 2014) . . . . . . . . . . . . . . . . . . 27

United States v. Jernigan, 341 F.3d 1273 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . 37

United States v. Ladson, 643 F.3d 1335 (11th Cir. 2011) . . . . . . . . . . . . . . . . . 48

United States v. Miller, 255 F.3d 1282 (11th Cir. 2001) . . . . . . . . . . . . . . . . 40, 41

United States v. Olano, 507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

United States v. Reeves, 742 F.3d 487 (11th Cir. 2014) . . . . . . . . . . . . . . . . . . . 45

United States v. Schier, 438 F.3d 1104 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . 22

United States v. Smith, 967 F.3d 1196 (11th Cir. 2020) . . . . . . . . . . . . . . . . 33, 35

United States v. Stephenson, 550 F. Supp. 3d 1246 (M.D. Fla. 2021) . . 32, 35, 37

United States v. Timmons, 283 F.3d 1246 (11th Cir. 2002) . . . . . . . . . . . . . . . 26

United States v. Villanueva, No. 8:12-CR-205-T-17MAP, 2016 U.S. Dist. LEXIS 86922 (M.D. Fla. July 5, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

United States v. Williams, No. 20-13352, 2022 U.S. App. LEXIS 14472 (11th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

United States v. Woodard, 531 F.3d 1352 (11th Cir. 2008) . . . . . . . . . . . . . . . . 27

Wainwright v. Greenfield, 474 U.S. 284 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . 40

Wisconsin v. Mitchell, 508 U.S. 476 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Statutes:

18 U.S.C. § 922(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8

18 U.S.C. § 924(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

18 U.S.C. 924(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 20, 23, 25-27, 46

18 U.S.C. § 924(c)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

18 U.S.C. § 924(c)(1)(A)(i)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

18 U.S.C. § 924(c)(1)(B)(ii)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 26

18 U.S.C. § 3231  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

21 U.S.C. § 841(a)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

21 U.S.C. § 846  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

26 U.S.C. § 5861(d)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1291  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

<u>Miscellaneous</u>:

Amy Binder, Constructing a Racial Rhetoric: Media Depictions of Harm in
    Heavy Metal and Rap Music, 58 Am. Soc. Rev. 753  (1993) . . . . . . . . . . 36

Andrea Dennis, Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal
    Evidence, 31 Columbia Journal of Law & The Arts 1 (2007) . . . . . . . . 31

Charis E. Kubrin & Erik Nielson, Rap on Trial, 4 RACE & JUST. 185 (2014)  30

Fed. R. Crim. Proc. 29  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fed. R. Evid. 401  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 15, 16, 29

Fed. R. Evid. 403  . . . . . . . . . . . . . . . . . . . . . 1, 5, 8, 16, 23, 24, 29, 31, 35, 37

Fed. R. Evid. 403 advisory committee's note to 1972 amendment  . . . . . . . . . 35

Henry Louis Gates, Jr., Foreward to The Anthology of Rap xxv (Adam Bradley
    & Andrew DuBois eds., 2011)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

James D. Johnson, Sophie Trawalter & John F. Dovidio, Converging Interracial
    Consequences of Exposure to Violent Rap Music on Stereotypical
    Attributions of Blacks, 36 J. Experimental Soc. Psych. 233 (2000) . . . . . 36

Kelly McGlynn, Jacob Schriner-Briggs, and Jacquelyn Schell, *Lyrics in Limine: Rap Music and Criminal Prosecutions*, https://www.americanbar.org/groups/communications_law/publications /communications_lawyer/2023-winter/lyrics-limine-rap-music-and-criminal-prosecutions/ (Jan. 11, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . 31, 35, 38

Peter J. Rentfrow & Samuel D. Gosling, *The Content and Validity of Music-Genre Stereotypes Among College Students*, 35 Psych. of Music 306, 315-18 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Stuart P. Fischoff, *Gangsta' Rap and a Murder in Bakersfield*, 29 J. Applied Soc. Psych. 795 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Theresa A. Martinez, *Popular Culture as Oppositional Culture: Rap as Resistance*, 40 SOC. PERSP. 265 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . 30

Tricia Rose, *Black Noise: Rap Music and Black Culture in Contemporary America* 22 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

U.S. Const., amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 16, 23, 30, 31, 38

U.S. Const., amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 39

U.S.S.G. § 4B1.1(c)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## STATEMENT OF JURISDICTION

This is a direct appeal from a judgment in a criminal case. The judgment appealed from was entered on March 25, 2024. Doc. 99. The defendant timely filed notice of appeal on March 15, 2024, following the oral pronouncement of the sentence. Doc. 98. The district court exercised jurisdiction over the case pursuant to 18 U.S.C. § 3231. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES</u>

I. Whether the district court erred in denying Mr. Jones's motion for judgment of acquittal on Count Three, which charged him with possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. 924(c), where there was insufficient evidence that the firearms were possessed in furtherance of the drug trafficking offenses.

II. Whether Mr. Jones's convictions must be reversed because the district court abused its discretion when it permitted the government to introduce Mr. Jones's rap music videos, images, and lyrics at trial despite the probative value of the evidence being far outweighed by Rule 403 concerns.

III. Whether Mr. Jones's convictions must be reversed because his Fifth Amendment rights were violated when the government's attorney and law enforcement witness commented on his post-*Miranda*[1] silence during the government's case in chief.

IV. Whether Mr. Jones's convictions must be reversed because the prosecutor improperly quoted and relied on an exhibit that was not admitted in evidence during the government's closing argument.

V. Whether the cumulative effect of multiple trial errors violated Mr. Jones's

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966)

1

substantial rights and deprived him of a fair trial.

## STATEMENT OF THE CASE

Defendant-Appellant Hassan Jones, who is incarcerated, appeals his conviction.

I. Course of Proceedings & Disposition in Court Below

In May 2021, Mr. Jones was arrested following a traffic stop on Interstate 12 in St. Tammany Parish, LA. Mr. Jones was the rear-seat passenger in a car occupied by two other persons. Doc. 111 at 49-64. Officers searched the car and seized a Glock handgun that belonged to the front-seat passenger, drug paraphernalia, a small amount of marijuana, and 18 pint-sized bottles of promethazine syrup. *Id.* A search of Mr. Jones revealed $5372 cash in his pockets, which was seized along with his cell phone. *Id.* In February 2023, Mr. Jones was arrested again in Mobile County, AL, after a search warrant was executed at the apartment where he was staying with his girlfriend and her family. Doc. 111 at 185-228. From the apartment, officers seized two Glock handguns, one of which was equipped with a machine-gun conversion device known as a "Glock switch," ammunition, cell phones, and narcotics. *Id.* From the trunk of Mr. Jones's girlfriend's car, officers seized approximately four pounds of marijuana. *Id.*

These arrests led to the charges in the instant case. In June 2023, Mr. Jones was charged by superseding indictment with one count of conspiracy to possess

with intent to distribute marijuana in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1) (count one); one count of possession with intent to distribute 1859 grams of a substance containing a detectable amount of marijuana in violation of 21 U.S.C. § 841(a)(1) (count two); one count of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 924(c)(1)(B)(ii) (count three); one count of illegal possession of a firearm by a prohibited person (felon) in violation of 18 U.S.C. § 922(g)(1) (count four); and one count of possession of an unregistered firearm in violation of 26 U.S.C. § 5861(d) (count five). Doc. 59.[2] The firearms charged in counts three and four were a .40-caliber Glock, model 22, pistol equipped with an extended magazine containing 22 rounds of ammunition ("the Glock 22") and a .40-caliber Glock, model 23, pistol equipped with a machine-gun conversion device commonly known as a "Glock switch" and an extended magazine containing 14 rounds of ammunition ("the Glock 23"). *Id.* The firearm charged in count five was the Glock 23. *Id.* The conspiracy alleged in count one existed from March 2021, shortly before Mr. Jones's arrest in Louisiana, to February 2023, the date of Mr. Jones's arrest following execution of the search warrant in

---

[2]Record references throughout the brief are made to the document number on the district court's electronic docket sheet followed by page numbers assigned to those documents by the district court's electronic filing system.

4

Alabama. Doc. 59.

Mr. Jones went to trial and was convicted by a jury on all counts. Doc. 84. The district court sentenced him to serve 540 months in prison followed by five years on supervised release. Doc. 99. Mr. Jones, who is incarcerated, timely filed notice of appeal from the judgment. Doc. 98.

II. <u>Statement of Facts</u>

A. Motion to Exclude Artistic-Production Evidence

In a pre-trial pleading, Mr. Jones's counsel asked the court to preclude the government from offering as evidence in its case-in-chief Mr. Jones's "artistic productions," such as music videos. Doc. 74 at 1. Counsel argued:

> Mr. Jones requests that the United States be precluded from offering his artistic productions, to wit, music videos and lyrics, as evidence in their case in chief. The United States has produced copies of numerous music videos that Mr. Jones has created and performed in. All of the art is fictional and for entertainment purposes. Mr. Jones's art is not relevant to the charged conduct. Additionally, it runs a high likelihood of distracting and confusing the jury. Furthermore, rap music in particular can easily inflame the passions of the jury, and severely prejudice Mr. Jones. As such, it is inadmissible under Rule 401 and Rule 403.

> Admitting such artistic evidence would not only be prejudicial to Mr. Jones without serving a legitimate purpose at trial, but as a general policy would produce a chilling effect on artistic expression. If artists must exist in a paradigm in which their fictional accounts and depictions can be weaponized against them in court, then they will feel restrained from fully expressing their artistic ideas. Global culture will suffer.

*Id.*

The district court heard additional argument on this matter in court on the first day of trial. Doc. 111 at 15. Mr. Jones's counsel argued that the music videos were not relevant because they are "fictionalized entertainment productions." *Id.* at 16. He argued that introducing the videos "would be like if you put Clint Eastwood on trial for murder and you wanted to show Dirty Harry as evidence and say what a violent guy he is. Or if you were trying Johnny Cash and you wanted to play Folsom Prison Blues." *Id.* He further argued that introducing the videos ran the risk of inflaming and confusing the jury. *Id.* Finally, he urged the court to exclude the evidence under the First Amendment because "if [an] individual's artistic productions are allowed to be used against them in court, then that will have a chilling effect on the expression of free speech[.]" *Id.* at 16-17.

The government responded that it would "show screenshots that have been preserved of the videos" and not introduce the videos themselves. *Id.* at 17. But Mr. Jones's counsel argued that this would not fix the issue because "those images are screen grabs from the videos where, you know, just like in Hollywood productions, people use props." *Id.* at 20. Counsel also argued that the evidence was likely to become cumulative. *Id.* at 21.

The district court declined to exclude the evidence "preliminarily" and told

Mr. Jones's counsel to raise the issue again during trial when the evidence was offered. *Id.* at 21.

B. Jury Selection

Because the government gave notice of its intent to introduce Mr. Jones's music videos as evidence, prospective jurors were asked during jury selection if they regularly listened to rap or hip hop music. Doc. 110 at 60, 88. Only four prospective jurors said that they did. *Id.* at 88. None of those four prospective jurors were selected for the jury. *Id.* at 102. In the context of an unsuccessful *Batson*[3] challenge, Mr. Jones's counsel noted there were only four black people in the 44-person venire, and all four of the prospective black jurors were women. *Id.* at 93-94. There were no black men in the pool. *Id.* at 93. One of the black women was excused for cause. *Id.* at 93. The government used a peremptory strike to remove a second black woman. *Id.* at 93-94. The government cited a race-neutral reason for its strike, but Mr. Jones's counsel nonetheless argued that "the jury that Mr. Jones is ultimately going to be tried before is not representative of our community." *Id.* at 94.

C. Trial

---

[3] *Batson v. Kentucky*, 476 U.S. 79 (1986).

7

The parties entered an *Old Chief*[4] stipulation regarding Mr. Jones's felon status and a *Rehaif*[5] stipulation regarding Mr. Jones's knowledge of his felon status. The parties also stipulated that the charged firearms were manufactured outside of Alabama. These stipulations were read to the jury at the outset of trial. Doc. 111 at 48. The government then called 11 witnesses to testify about events surrounding Mr. Jones's two arrests.

1. The traffic stop

Detective James Kelley of the St. Tammany Parish Sheriff's Office conducted the traffic stop on I-12. Doc. 111 at 49-52. When stopped, the car was traveling eastbound towards Mobile. *Id.* at 52. The car was stopped for speeding and a lane violation. *Id.* A woman, Deja Gray, was driving and two men were passengers, one seated in the front passenger seat, Isaiah Kelly, and one seated in the rear passenger-side seat, Mr. Jones. *Id.* at 53, 57, 58. Mr. Kelly was Ms. Gray's boyfriend, and she called him "Spec." *Id.* at 58. Ms. Gray referred to Mr. Jones as "Hot." *Id.*

The stop, which occurred around midnight, was recorded by a body-worn

---

[4] *Old Chief v. United States*, 519 U.S. 172 (1997)(holding that to avoid a Rule 403 violation, a district court must accept a defendant's ofer to stipulate to the fact of a prior conviction).

[5] *Rehaif v. United States*, 139 S. Ct. 2191 (2019)(holding that § 922(g)(1) and 18 U.S.C. § 924(a)(2) require proof that the defendant knew he belonged to a category of persons barred from possessing a firearm).

camera. *Id.* at 54, 59, & Gov't Exh. 2A-2C. Det. Kelley smelled marijuana emanating from the car as soon as the windows were rolled down. *Id.* at 59. None of the occupants could produce physical identification when asked. *Id.* at 60. Ms. Gray said that they were headed from Dallas, TX, back to Mobile, AL, and had stopped over in New Orleans, LA. *Id.* at 58. Mr. Jones said they were coming from Houston, TX. *Id.* at 60.

Believing he had probable cause based on the smell of marijuana, Det. Kelley searched the car. *Id.* at 60-62. Inside the car, he found a Glock 9-mm handgun with an extended magazine under the front passenger seat, a rolling tray with marijuana remnants and a pack of cigars in the glove box, a second pack of cigars on the front passenger floor, a third pack of cigars containing two marijuana blunts in a rear seat pocket, and approximately $317 cash. *Id.* at 62-65. He found a "wad of money," $5372, packaged "with rubber bands" in Mr. Jones's front pants pocket. *Id.* at 64, 74, 82. In the trunk, he found a suitcase containing 18 bottles of promethazine hydrocodone syrup. *Id.* at 64-65. Mr. Kelly, the front passenger, claimed ownership of the gun. *Id.* at 72. Mr. Jones denied knowledge of the marijuana and promethazine. *Id.* at 73. He explained that the cash found in his pocket was intended to pay for work on his teeth. *Id.* Det. Kelley believed the way the cash was "repackaged" was "commonly seen and related with narcotics transactions." *Id.* at 74. When he asked Mr. Jones

9

where the money came from, Mr. Jones told him he earned it working at a tire and paint shop. *Id.* at 80-81. He said he made $50/day four to five days a week and was paid in cash. *Id.* at 81. Det. Kelley was unable to confirm this employment and the source of the funds. *Id.* at 83-84.

Det. Kelley seized Mr. Jones's cell phone and obtained a warrant to search it. *Id.* at 84. An analysis of the phone's contents revealed "[n]umerous photographs of narcotics, firearms, large amounts of currency, and numerous phone text message conversations with various individuals regarding narcotics transactions taking place." *Id.* at 86.

Deyana Sevin, a forensic scientist in the narcotics section of the St. Tammany Parish Sheriff's Office crime lab, tested the substances found in the car and trunk and determined that they contained marijuana and promethazine. *Id.* at 94, 100-102.

Paul Tullier, a detective and technical investigator in the narcotics section of the St. Tammany Parish Sheriff's Office, extracted information from Mr. Jones's cell phone, including Instagram notes, chats, images, videos, Safari browser searches, Apple Maps searches, and location data created from March to May 2021. *Id.* at 104-05, 110, 117-182. These were introduced into evidence and read or described to the jury by Det. Tullier. *Id.* at 117-182; Gov't Exhibits 5E-5CC. Mr. Jones's counsel objected to admission of many of these exhibits, arguing that

10

the contents of the exhibits were irrelevant, prejudicial, cumulative, and/or contained hearsay. *Id.* at 117, 129-133, 155, 159, 161, 164, 167-169, 171-174, 177-181. Det. Tullier did not examine any of the guns depicted in the photos and videos to determine if they were real guns or prop guns. *Id.* at 184. One of the videos appeared to be a professionally-produced music video. *Id.*

2. The search warrant execution

Charles Hunter and Philip Morris, corporals with the City of Mobile Police Department, participated in the search warrant execution on February 1, 2023, at the apartment where Mr. Jones was staying. Doc. 111 at 185-186, 229. Around 5:45 a.m., a SWAT unit led by Corporal Morris breached the apartment after "down[ing]" one man outside and called the residents out. *Id.* at 187, 230; Gov't Exhibit 9. Five people were at the apartment: Mr. Jones; his girlfriend, RaKayla Edwards; their baby; and Ms. Edwards' parents, Ricky and Diane Edwards. *Id.* at 187. They called Mr. Jones out by name, and he immediately came out with his hands up. *Id.* at 232. He emerged from a bedroom on the left side of the hallway, and that bedroom became the focus of the search. *Id.* at 188, 232-233. Inside that bedroom, officers found a partially-smoked marijuana blunt on a counter, a shoe box containing ammunition in the closet, a cell phone on the floor, a cell phone on top of a dresser, a Glock 22 with a laser sight and extended magazine in a dresser drawer, an empty bottle of suspected codeine syrup in the same

11

dresser drawer, a prescription bottle of codeine bearing Mr. Jones's name and address, and a Glock 23 with an extended magazine and a Glock switch on top of a clothes hamper in the closet. *Id.* at 190-191, 199-209; Gov't Exhibits 6A-6E, 7A, 8A. Officers found a black backpack containing four pounds of vacuum-sealed marijuana in the trunk of a Nissan Sentra in the apartment complex's communal parking lot that was about 60 or 80 feet from the building where the apartment was located.[6] *Id.* at 210-211, 224-225; Gov't Exhibit 6F, 6G. A key to the Sentra was found inside the apartment. *Id.* at 228.

Corporal Hunter explained the Glock switch to the jury. He said it is "a machine gun conversion device which will allow the device – once it's installed onto a firearm, it allows the pistol to fire in an automatic fashion." Doc. 111 at 209. He said a switch "allows the weapon to fire multiple round of ammunition . . . converting it into a machine gun." *Id.* at 209.

Then, still in its direct examination of Corporal Hunter, the prosecutor asked Hunter if he had taken a DNA sample from Mr. Jones after his arrest and asked him to "describe for us that process." Doc. 111 at 216. Corporal Hunter responded by saying:

---

[6] In his suppression hearing testimony, Corporal Hunter said that the Nissan Sentra belonged to RaKayla Edwards' mother and was used by RaKayla Edwards and Mr. Jones. Doc. 109 at 15-16, 32-33.

At the conclusion of the search warrant, Mr. Jones was transported to Metro Jail before I could do any followup investigation. No interview was conducted with Mr. Jones as he invoked his right to an attorney after I advised him of Miranda rights.

So at a later time, I obtained a search warrant for his – for a buccal swab from Mr. Jones. At a court appearance, Mr. Jones was brought into a side conference room at the Mobile County district courthouse and I presented him with the warrant. He gave a voluntary swab, and I collected two swabs in his – I utilized two swabs, cotton swabs. They are sterile swabs. They were opened in his presence, and they were sealed in his presence.

*Id.* at 216; Gov't Exhibit 12.

About five minutes later in the government's direct examination of Corporal

Hunter, the following exchange occurred between the prosecutor and witness:

Q     And, additionally, in speaking about Hassan Jones, you said that you attempted to interview him but he invoked his – or after Mirandizing him, he invoked his rights, correct?
A     That is correct.
Q     And then he was taken to MPD?
A     No. He was taken – well, there's a short stop at the western administrative complex. There was another agency that wanted to speak to him. Once we got the evidence kind of situated a little bit and some administrative items were taken care of, he was then transported to Metro Jail.

*Id.* at 219-220. Mr. Jones's counsel did not object to this exchange or to Hunter's

spontaneous statement about post-Miranda silence. On cross examination of

Corporal Hunter, Mr. Jones's counsel asked him, "Mr. Jones did not make any

statements on the scene?," to which Hunter responded, "No, he did not." Doc.

111 at 227.

13

Alisha Davis-Sonnier, a crime scene investigator and latent print examiner for the City of Mobile Police Department, swabbed the firearms found in the apartment for prints and DNA. Doc. 112 at 250, 252; Gov't Exhibit 11. She found no useable prints on the guns. *Id.* at 256.

Amanda Murray, a DNA analyst at DNA Labs International, compared Mr. Jones's DNA to DNA retrieved from the two firearms. Doc. 112 at 258, 264-268. She found "very strong support" for the conclusion that Mr. Jones contributed DNA to the mixed DNA profiles found on the guns. *Id.* at 268-270, 272-274.

Gregory Stimmel, an acting deputy division chief within the firearms and ammunition technology section of the ATF, testified as an expert in firearms classification. Doc. 112 at 282. He examined the Glock 23 and concluded that it had been modified with a "machine gun conversion device," the only purpose of which is to allow the gun to "shoot automatically as a machine gun." *Id.* at 285-291. After test-firing the gun, he concluded it functioned as a machine gun. *Id.* at 292-294.

Kimberly Suhi, a senior special agent for the ATF, was the federal case agent. Doc. 112 at 297, 299. According to Agent Suhi, the Glock 23 had been purchased in March 2022 by a man named Naquarius Braxton, who had also been charged in federal court for possessing a Glock switch. *Id.* at 301-302, 305;

Gov't Exhibit 16. Neither the gun nor Mr. Jones's name appeared in the

National Firearms Registration & Transfer Record, meaning the gun had not

been registered there as required by law. *Id.* at 303-304; Gov't Exhibit 17.

Agent Suhi extracted information from the cell phones seized from the

apartment during execution of the search warrant in February 2023. Doc. 112 at

306, 332; Gov't Exhibits 7C, 7D, 8C, 8D. One of the phones, a black iPhone,

was associated with Apple ID thehardestout@iCloud.com, an email address that

Agent Suhi did not believe was associated with Mr. Jones. *Id.* at 307, 428. The

only account on the phone associated with Mr. Jones was an Instagram account,

and there were accounts on the phone associated with other people, such as a

man named Brandon White. *Id.* at 428. Agent Suhi did not know who had access

to the phone. *Id.* at 429. The second phone, a blue iPhone, was associated with

Apple ID davis.laderdrick1@gmail.com, whom Agent Suhi said was Mr. Jones's

younger brother. *Id.* at 334, 432-433. Mr. Jones was in jail from October 5, 2021,

to March 22, 2022, a period during which some of the information retrieved

from the phone was created. *Id.* at 431-432.

Agent Suhi extracted notes, texts, images, and videos from the phones which

she read to or described for the jury at trial. *Id.* at 309-343; Gov't Exhibits 7E-

7L, 7N, 8E-8I. Mr. Jones's counsel objected to admission of much of this

information under Federal Rules of Evidence 401 and 403 and on grounds that

the information contained hearsay or had not been properly authenticated. *Id.* at 315-317, 320, 322-324, 327, 329-331, 336-338, 342. Notes retrieved from the phones contained lists of names with dollar amounts next to the names, which Agent Suhi said were lists of customers and money owed. *Id.* at 319-320; Gov't Exhibit 7E. One photograph showed Mr. Jones holding the Glock 22. *Id.* at 331-332; Gov't Exhibit 7N. Agent Suhi identified Mr. Jones in the photo by his tattoos and watch. *Id.* at 332. One exhibit, 8H, consisted of a redacted local news story about the federal prosecution of a random man for possession of Glock switches, which the prosecutor argued showed Mr. Jones's knowledge of the illegality of possessing Glock switches. *Id.* at 337-341.

Agent Suhi also gathered publicly-available videos posted by Mr. Jones under the username "Hotboy23" on YouTube. *Id.* at 343; Gov't Exhibits 18A-18I. The videos depicted Mr. Jones performing or rapping. *Id.* at 434. Agent Suhi acknowledged that rap videos typically show drugs and guns. *Id.* Screen shots from these videos were admitted at trial over Mr. Jones's objections under Rules of Evidence 401, 403, and the First Amendment. *Id.* at 345-356. The screen shots appeared to show Mr. Jones with marijuana, cash, and firearms, at least two of which were equipped with machine gun conversion devices. *Id.* Agent Suhi could not tell if the guns were real guns or prop guns. *Id.* at 347, 349, 350, 435. One of the YouTube videos, which had been posted in June 2022 by

16

Hotboy23 and "KFN Spec," who is Isaiah Kelly, bore the following warning: "Warning. We do not promote gang violence. Any type of material used in the making of this music video were for entertainment purposes only. All props, scenes, and lyrics should not be taken seriously." *Id.* at 352; Gov't Exhibit 8G.

Agent Suhi also obtained a search warrant to access the Instagram account associated with the phones, Darealgway_23. Doc. 112 at 308-309; Gov't Exhibit 19A, 19B. Agent Suhi retrieved pictures, texts, videos, notes, chats, and stories from the account which she read or described to the jury. *Id.* at 359-424; Gov't Exhibits 19C-19F, 19H-19N, 19P, 19Q, 19S-19X, 19AA-19GG, 19II, 19MM-19OO. The images showed guns, machine gun conversion devices, promethazine syrup, and marijuana. *Id.* In one video, Mr. Jones is depicted stating, "These are switches on these Glizzies and we never have to aim." *Id.* at 363; Gov't Exhibit 19E. Mr. Jones's counsel objected to admission of much of this information on grounds of hearsay. *Id.* at 360, 362, 363, 370, 394, 398, 400, 401, 403, 405, 408, 412, 413, 415, 416, 419, 421. Beginning with Exhibit 19M, Mr. Jones's counsel also began objecting that some of the exhibits were cumulative or irrelevant. *Id.* at 395, 397, 398, 401, 403, 405, 413, 415, 423; Gov't Exhibits 19M, 19P, 19Q, 19T, 19V, 19X, 19DD, 19EE, 19OO.

Meghan Underwood, a forensic scientist with the Alabama Department of Forensic Sciences, tested the substances seized from the trunk of the Nissan

Sentra and concluded it was marijuana. Doc. 112 at 438-439, 457, 461. However, Mr. Jones's counsel objected to her testimony on grounds that she did not test the substances to determine if they were marijuana, which is a controlled substance, or hemp, which is not a controlled substance. *Id.* at 458-462.

The final witness was Amber Westfall, a special agent with the DEA in Mobile, AL, who testified as an expert in drug trafficking and drug terminology. *Id.* at 471-473. She did not take part in the investigation of Mr. Jones's case. *Id.* at 484, 488. Agent Westfall said that the vacuum-sealed packaging and quantity of the substances found in the trunk of the Nissan Sentra were indications that the substances were intended for distribution. *Id.* at 474-475. She identified a "drug ledger," or accounting of how much each customer owed, in Government Exhibit 7E. *Id.* at 477. She also defined for the jury common drug terms, such as "zip," "fronting," "gas," or "smoke." *Id.* at 476, 478, 481. She said that the substance appearing in Government Exhibit 19II appeared to be marijuana because "[i]t's green; it's leafy; it has the bud look that marijuana normally has." *Id.* at 478. She said the price of marijuana in Mobile was between $1400-2400 a pound, depending on the "different contents of THC." *Id.* at 479. Marijuana has different strains often named after pop-culture references, such as "Skittles" or "Runtz." *Id.* at 480. Drug proceeds, she said, are typically "rubber banded in certain denominations" and then combined and "further rubber banded." *Id.* at

18

481. To determine if monies are drug proceeds, the DEA will look at "employment history," a suspect's statements, phone data, and a suspect's day-to-day activities. *Id.* at 481. Agent Westfall said that "bulk marijuana distribution" and guns are connected because guns are used for security to protect product and proceeds. *Id.* at 476-477. She said, Glock switches are commonly found in connection with drug distribution. *Id.* at 482. Agent Westfall acknowledged that guns and rubber bands are used for purposes other than drug dealing. *Id.* at 486, 487.

D. Motions, Closings, Jury Instructions & Verdict

Following Agent Westfall's testimony, the government rested, and Mr. Jones's counsel moved for judgment of acquittal under Federal Rule of Criminal Procedure 29 "on all counts but especially Counts One, Two, and Three because the government was not able to offer evidence of – that the substance in question was, in fact, a controlled substance." *Id.* at 490, 491. He also argued that the government had not proved a conspiracy on Count One, as opposed to buyer/seller relationships. *Id.* at 494. Viewing the evidence in the light most favorable to the non-movant, the court denied the motion. *Id.* at 495. The court then explained to Mr. Jones his right to testify. *Id.* at 498-499. After consulting with his counsel, Mr. Jones decided not to testify, and the defense also rested. *Id.* at 500.

19

During the government's closing argument, in the process of summarizing the evidence that it argued supported a conviction on the § 924(c) count, the prosecutor told the jury to:

> Take a look at Government's Exhibit 19Z. Messages from the defendant's Instagram. What are these about? We got 1,700 apiece. I brought weed with my money and told you I would have eff with after I sold it and you. Right? What's the defendant respond? I'm through talking. I'm going to smoke you if you don't have my money.
> All you need to know about the defendant's possession of firearms in furtherance of drug dealing in one message. But you don't just have one message. You have message after message after message.

Doc. 113 at 541-42. Government Exhbit 19Z, which the prosecutor was quoting in this passage, was not admitted into evidence. Doc. 85-4 at 11.

In his closing argument, Mr. Jones confessed to possessing the Glock 22 charged in count four but denied guilt on the other charges and denied possessing the Glock 23. Doc. 113 at 549-554.

The jury returned a guilty verdict on all counts and found, with respect to Count Three, that Mr. Jones possessed the Glock 23 in furtherance of the drug-trafficking crimes in Count One and/or Count Two and that the Glock 23 equipped with a Glock switch was a machine gun. Doc. 113 at 593-595. After the jury's verdict was read, Mr. Jones's counsel renewed all previous objections. *Id.* at 596.

20

E. Presentence Report & Sentencing

The probation office calculated the advisory sentencing guideline range under the 2023 Guidelines Manual. Sealed Doc. 92 at 13. Because he was determined to be a career offender due to prior convictions for assault and robbery and had a mandatory consecutive sentence of 30 years for his conviction on Count 3, Mr. Jones's combined guideline imprisonment range was 720 months to life under U.S.S.G. § 4B1.1(c)(2)(A). *Id.* at 14, 16, 17, 22. However, the sentence that could be imposed on each count was capped by statutory maximums. *Id.* at 22. The parties did not object to this guideline calculation, and the court adopted the presentence report. Doc. 114 at 4.

Mr. Jones's counsel filed a sentencing memorandum and 37 letters in support of Mr. Jones at sentencing. *Id.* at 6-7. He argued that Mr. Jones's life had taken a sharp, negative turn at age 12 following the premature death of his father. *Id.* at 8-9. At that time, his life became unstable, and he succumbed to the negative elements of the streets in the crime-ridden neighborhood where he lived with his mother and five siblings in Section 8 housing. *Id.* at 9-15. During allocution, Mr. Jones apologized for taking up the court's resources and apologized to his family, especially his children and their mother, for hurting and leaving them. *Id.* at 16. He told the court that he was eager to take programs to improve himself and "do whatever it takes to become a better person." *Id.* He was only 25 years

21

old at sentencing. *Id.*

Impressed by the support Mr. Jones received from family and friends but concerned about Mr. Jones's criminal history, the court chose a 540-month sentence (the statutory maximum sentences of 60 months on Counts 1 and 2, 180 months on Count 4, and 120 months on Count 5, all to run concurrently; 360 months on Count 3, run consecutively to the other sentences). Doc. 114 at 25. The court noted, "I'll be quite frank. I don't particularly care for this sentence." *Id.* at 23. The court also imposed two three-year supervised release terms and three five-year supervised release terms, all to run concurrently. *Id.* Mr. Jones timely filed notice of appeal from the judgment. Doc. 98.

III. <u>Standards of Review</u>

This Court reviews the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences in favor of the verdict. *United States v. Schier*, 438 F.3d 1104, 1107 (11th Cir. 2006).

This court reviews district court rulings on the admissibility of evidence under an abuse of discretion standard. *United States v. Hawkins*, 934 F.3d 1251, 1264 (11th Cir. 2019). "An abuse of discretion arises when the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an

22

improper application of law to fact." *United States v. Baker*, 432 F.3d 1189, 1202 (11ᵗʰ Cir. 2005).

Issues not preserved below are reviewed for plain error. *Hawkins*, 934 F.3d at 1264.

## SUMMARY OF THE ARGUMENT

The district court erred in denying Mr. Jones's motion for judgment of acquittal on Count Three, which charged him with possessing two firearms in furtherance of drug trafficking crimes in violation of 18 U.S.C. 924(c), because the guns charged in the indictment were not found in close proximity to drugs or drug proceeds, were not readily available for use in protecting drugs or drug proceeds or in facilitating drug distribution, and were not shown to have been otherwise used in furtherance of the drug offenses. As a result, Mr. Jones's conviction on Count Three should be reversed and rendered.

Mr. Jones's convictions on all counts should be reversed and remanded for three additional reasons. First, the district court abused its discretion when it permitted the government to introduce Mr. Jones's rap music videos, images, and lyrics at trial despite the probative value of the evidence being far outweighed by Rule 403 concerns. The evidence had no probative value because the lyrics and videos were fictional artistic creations protected by the First

23

Amendment that did not tie Mr. Jones to the specific crimes charged in the indictment. The guns depicted in the images were not the guns charged in the indictment or even shown to be real guns. The probative value of the evidence was substantially outweighed by Rule 403 concerns, particularly a concern that the evidence might lead the jury to decide the case on a racially-charged emotional basis given the public's beliefs about rap music and the composition of Mr. Jones's jury. The evidence was also cumulative.

Second, Mr. Jones's Fifth Amendment rights were violated when, during the government's case in chief, the prosecutor and a law enforcement witness commented on Mr. Jones's post-*Miranda* silence following his arrest. This was a plain, constitutional error that was not harmless beyond a reasonable doubt because the government's evidence was not overwhelming on every count of the indictment, particularly Count Three. The Court should exercise its discretion to correct the error because it is precisely the type of plain error—an error involving deprivation of a fundamental constitutional right—likely to call into question the fairness, integrity, and public reputation of the judicial proceeding. Defendants cannot be advised of the right to remain silent only to have that silence subsequently used against them at trial.

Third, during the government's closing argument, the prosecutor improperly

24

quoted and relied on an exhibit that was not admitted in evidence. This was also a plain error that violated Mr. Jones's substantial rights and is worthy of correction because the alleged statement of Mr. Jones in the exhibit was a violent statement that strengthened the government's argument that Mr. Jones possessed guns in furtherance of drug dealing in support of the charge in Count Three, the weakest count in the indictment. The prosecutor affirmed the importance of the exhibit to its case when she characterized the statement as "[a]ll you need to know about the defendant's possession of firearms in furtherance of drug dealing in one message." Doc. 113 at 542.

Finally, the cumulative effect of these multiple trial errors violated Mr. Jones's substantial rights and deprived him of a fair trial.

## <u>ARGUMENT AND CITATIONS OF AUTHORITY</u>

**I. The district court erred in denying Mr. Jones's motion for judgment of acquittal on Count Three, possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. 924(c), because there was insufficient evidence that the firearms were possessed in furtherance of the drug trafficking offenses.**

The evidence is insufficient to support the jury's conclusion that Mr. Jones possessed the firearms charged in Count Three of the superseding indictment in

furtherance of the drug trafficking crimes.[7] As relevant here, 18 U.S.C. § 924(c) provides that any person who possesses a firearm in furtherance of a drug trafficking crime shall receive an additional punishment of "not less than 5 years" or,  if the firearm is a "machinegun," "not less than 30 years."[8]  18 U.S.C. § 924(c)(1)(A)(i); 18 U.S.C. § 924(c)(1)(B)(ii). The "in furtherance" element requires proof that "the firearm helped, furthered, promoted, or advanced the drug trafficking." *United States v. Timmons*, 283 F.3d 1246, 1252 (11th Cir. 2002). "[T]he presence of a gun within the defendant's dominion and control during a drug trafficking offense is not sufficient by itself to sustain a § 924(c) conviction.

_____

[7] Section 924(c)(1)(A) says it is illegal to possess a firearm in furtherance of "any drug trafficking crime for which the person may be prosecuted in a court of the United States," and this Court has held that a defendant does not have to be convicted of, or even charged with, the predicate drug-trafficking offense to be convicted under § 924(c). *United States v. Frye*, 402 F.3d 1123, 1127 (11th Cir. 2005). However, in this case, the superseding indictment charges, and the jury was instructed, that the § 924(c) offense was predicated on the drug-trafficking offenses charged in Counts One and Two of the superseding indictment. Doc. 59 at 2-3; Doc. 113 at 569. With respect to the enhanced-penalty provision at § 924(c)(1)(B)(ii), the jury was asked to find specifically whether Mr. Jones "Possessed the Glock, model 23, .40 caliber pistol, serial number BWBT052, equipped with an extended magazine containing 14 rounds of .40 caliber ammunition, referenced as item 2 in Count Three, in furtherance of the drug-trafficking crime(s) in Count One and/or Count Two of the Superseding Indictment." Doc. 85 at 5-6. As a result, the jury's verdict convicting Mr. Jones of Count Three is predicated solely on the drug offenses in Counts One and Two, not on *any* drug trafficking crime.

[8] Section 924(c) also prohibits the use or carrying of a firearm "during and in relation to any crime of violence or drug trafficking crime," but Mr. Jones was not indicted under this aspect of § 924(c). *See* Doc. 59 at 2-3.

*Id.* at 1253. The government must prove a nexus between the gun and the drug trafficking crime. *United States v. Isnadin*, 742 F.3d 1278, 1307 (11th Cir. 2014)("The [G]overnment must also establish some nexus between the firearm and the drug trafficking offense to show possession was in furtherance of the crime.").

This Court considers several factors in determining whether a defendant possessed a firearm "in furtherance" of a drug trafficking crime, such as: "[t]he type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to the drugs or drug profits, and the time and circumstances under which the gun is found." *Id.* Physical proximity between the firearms and drugs is particularly important. In many cases, this Court has afforded physical proximity great weight in determining the sufficiency of the evidence under § 924(c). *See*, e.g., *United States v. Woodard*, 531 F.3d 1352, 1362 (11th Cir. 2008)("Woodard had a loaded pistol, with a round in its chamber, in his waistband - he had easy access to the pistol and it was ready to be used - while taking delivery of packages containing roughly one hundred pounds of marijuana, an amount worth a considerable sum of money."); *United States v. Dasinger*, 650 Fed. Appx. 664, 674–675 (11th Cir. 2016)(emphasizing that "[t]he gun was loaded, easily accessible, and found in

27

close proximity to the drugs and cash");*United States v. Dixon*, 901 F.3d 1322, 1332, 1344 (11th Cir. 2018)(emphasizing that defendants "carried guns when they sold [drugs] out of the [drug] traps at night").

In contrast to those cases, the guns charged in this case were not found in close proximity to drugs or drug proceeds. They were not readily available for use in protecting drugs or drug proceeds or in facilitating drug distribution. Both guns were found at around 5:45 a.m. in a bedroom in an apartment that Mr. Jones shared with his girlfriend and her family. Doc. 111 at 186-188. The Glock 22 was found inside a dresser drawer in the bedroom, and the Glock 23 was found on a clothes hamper inside a closet. Doc. 111 at 202, 203, 205, 207. The only drugs found in the bedroom were personal use quantities—a partially smoked marijuana blunt, an empty bottle of suspected codeine syrup, and a bottle of codeine that had been prescribed to Mr. Jones. *Id.* at 190, 205, 206. The distribution quantities of marijuana were found in vacuum-sealed packages inside a backpack in the trunk of a locked car not shown at trial to be owned or used by Mr. Jones. Doc. 111 at 210, 211, 225. The car was parked in a communal parking lot that was 60 to 80 feet away from the front door of the building where the apartment was located. *Id.* The government did not present any evidence to demonstrate that the guns had a nexus to the drug trafficking offenses. As a result, the evidence was insufficient to support Mr. Jones's conviction on Count

28

Three.

## II. The district court abused its discretion when it permitted the government to introduce Mr. Jones's rap music videos, images, and lyrics at trial because the probative value of the evidence was far outweighed by Rule 403 concerns.

At trial, the district court, over defense objection under Rules 401 and 403 pre-trial and during trial, permitted the government to introduce into evidence Mr. Jones's fictionalized artistic expressions (music videos, lyrics, and images extracted from music videos) containing the motifs of popular rap and hip-hop music, including guns, drugs, and cash.[9] This evidence was inadmissible under Rule 401, which is evidence that "has any tendency to make a fact [of consequence in determining the action] more or less probable than it would be without the evidence," and Rule 403, which provides that "[t]he Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 401; Fed. R. Evid. 403.

---

[9] The evidence consisted of testimony from Detective Tullier, music lyrics in Government Exhibit 5E, a music video in Government Exhibit 5I, testimony from Special Agent Suhi, and screenshot images extracted from YouTube music videos in Government Exhibits 18A-18I. Doc. 111 at 117-18, 134, 148-49, 184, 239-42; Doc. 112 at 343-55.

A. <u>Background: Rap Music as Artform</u>

Rap lyrics and videos are protected by the First Amendment as art forms. *See Luke Records, Inc. v. Navarro*, 960 F.2d 134 (11th Cir. 1992)(reversing an injunction on rap lyrics as being obscene and not protected by the First Amendment). It is an art form frequently used to address social problems and political issues, giving "voice to the tensions and contradictions in the public urban landscape," Tricia Rose, Black Noise: Rap Music and Black Culture in Contemporary America 22 (1994), and has a "profound potential as a basis for a language of liberation." *Id.* at 144. It is "an expression of oppositional culture." Theresa A. Martinez, Popular Culture as Oppositional Culture: Rap as Resistance, 40 SOC. PERSP. 265, 268 (1997); Charis E. Kubrin & Erik Nielson, Rap on Trial, 4 RACE & JUST. 185, 189 (2014).

Rap draws on a history of black musical and storytelling traditions dating back centuries. It is a poetic form that utilizes a sophisticated manipulation of language, and "shattering taboos, sending up stereotype, and relishing risqué language and subject matter." Henry Louis Gates, Jr., Foreward to The Anthology of Rap xxv (Adam Bradley & Andrew DuBois eds., 2011). Most important for this case, though, is the fact that rap "complicates or even rejects literal interpretation." *Id.* Rap music contains metaphors and as more than one

30

scholar has accurately observed, "exaggerated and invented boasts of criminal

acts." Andrea Dennis, Poetic (In)Justice? Rap Music Lyrics as Art, Life, and

Criminal Evidence, 31 Columbia Journal of Law & The Arts 1, 13-14 (2007). It is

a genre particularly suited to the telling of tall tales. *Id.* at 22-23; *Tann v. United*

*States*, 127 A.3d 400, 468 (D.C. 2015)("[R]ap lyrics may employ metaphor,

exaggeration, and other artistic devices and can involve abstract representations

of events or ubiquitous storylines.").

### B. The Admissibility of Rap Music in Criminal Trials

Despite being art forms protected by the First Amendment, rap lyrics and

videos are "frequently used against artists in criminal trials." Kelly McGlynn,

Jacob Schriner-Briggs, and Jacquelyn Schell, Lyrics in Limine: Rap Music and

Criminal Prosecutions,

https://www.americanbar.org/groups/communications_law/publications/com

munications_lawyer/2023-winter/lyrics-limine-rap-music-and-criminal-prosecuti

ons/ (Jan. 11, 2023)("McGlynn"). The Supreme Court has recognized that the

First Amendment "does not prohibit the evidentiary use of speech to establish

the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508

U.S. 476, 489 (1993). Yet it is "hard to imagine a category of evidence more

deserving of exclusion" under Rule 403. McGlynn, at 2.

> The probative value of rap lyrics is highly questionable. As in many genres, artists often write under fictional personas, reference events in the new (including crimes), and employ lyrical hyperbole. Given the pervasive bias against rap music, jurors are even more likely to incorrectly interpret rap lyrics as literal or believe that rappers are more likely to act violently or engage in criminal activity.

*Id.*

This Court recognized the danger of admitting rap videos into evidence in *United States v. Gamory*, 635 F.3d 480 (11th Cir. 2011). There, the Court concluded that "the substance of the rap video was heavily prejudicial" because the lyrics in the video "contained violence, profanity, sex, promiscuity, and misogyny and could reasonably be understood as promoting a violent and unlawful lifestyle." *Id.* at 493. The prejudice outweighed the probative value because "the video was not clearly probative of [the defendant's] guilt" of the drug trafficking and money laundering charges in the indictment. *Id.* at 484, 493; *see also United States v. Stephenson*, 550 F. Supp. 3d 1246, 1253 (M.D. Fla. 2021)(finding that where rap lyrics "purportedly depict drug related activities" and "profane, offensive, and racially insensitive words and violent and sexual imagery," the "likely prejudice . . . greatly outweigh any probative value"). The probative value of the video was further limited because the defendant was not in the video and there was no proof that the defendant wrote the lyrics or adopted the "views and values reflected in the video." 635 F.3d at 493.

32

This Court has found the probative value of rap videos and lyrics to outweigh their prejudicial impact where the evidence supports the specific allegations in the indictment. *See*, e.g., *United United States v. Belfast*, 611 F.3d 783, 793, 820 (11th Cir. 2010)(admitting violent rap lyrics as more probative than prejudicial in prosecution for crimes related to state-sponsored torture, where the lyrics confirmed the defendant's association and continued identification with the organization, Liberia's Anti-Terrorism Unit, alleged to have committed the crimes and specifically contradicted defendant's exculpatory post-arrest statements"); *United States v. Smith*, 967 F.3d 1196, 1204-06 (11th Cir. 2020)(concluding that a music video was highly probative where it was the same music video the defendant showed the victim before robbing her and, in the video, the defendant wore the same jacket and carried a similar pistol as during the robberies).

C. <u>The evidence should not have been admitted in this case</u>.

Here, as in *Gamory*, the rap lyrics in Government Exhibit 5E are profane, offensive, racially insensitive and violent.[10] The images introduced by the

---

[10] The lyrics are: "100 rounds on a stick I'm just run down on they click got the Mac 11 ruger 57 and the f&n with no kick oin give af got who aye nigga with gang gone in a nigga shit we got them bows forem get a whole to him shake his ass like a pit yaaaa tell santa to drop that will I'm smokin opp pack wats his name got hit with up in his chest at least he shoot back[.]" Doc. 85-1 at 108, Gov't Exh. 5E.

33

government showed Mr. Jones (and other individuals not named in the superseding indictment) wearing clothes associated with urban street gangs, throwing gang signs, and handling what appear to be marijuana, large amounts of cash, and firearms. Gov't Exhibits 18A-18I. The firearms, some of which appear to be machine guns and other gangster-style weapons, are often being pointed at the viewer or at each other. *Id.* One image shows four young black men standing over and pointing guns at two other young black men who are lying on the ground. Doc. 85-2 at 191; Gov't Exhibit 18B. One image shows Mr. Jones and another person wearing ski masks and pointing what appear to be Tommy Guns at the camera. Doc. 85-3 at 15-18; Gov't Exhibit 18E.

The district court erred when it admitted this evidence. The evidence was irrelevant. It had no probative value because what was depicted in the video images was not real. In fact, one of the videos bore the following disclaimer: "Warning. We do not promote gang violence. Any type of material used in the making of this music video were for entertainment purposes only! All props scenes and lyrics should not be taken seriously." Doc. 112 at 352; Gov't Exhibit 8G. *See United States v. Villanueva*, No. 8:12-CR-205-T-17MAP, 2016 U.S. Dist. LEXIS 86922, *5 (M.D. Fla. July 5, 2016)(admitting rap video where rapper/defendant described the depicted events as "real" and the government argued that the trier of fact was entitled to "take [the defendant] at his word").

34

Moreover, the guns depicted in the videos were not the guns charged in the indictment and were not shown even to be real guns, as opposed to prop guns. Doc. 111 at 184; Doc. 112 at 347, 349, 350, 435. The video images did not link Mr. Jones to the specific crimes charged in the indictment as they have in other cases where music videos have been admitted. *See*, e.g., *Belfast*, 611 F.3d at 820; *Smith*, 967 F.3d at 1204-06.

Even assuming the evidence had some probative value, it was substantially outweighed by Rule 403 concerns. The inflammatory evidence was highly likely to lead the jury to decide the case on an improper emotional basis, which is prohibited by Rule 403. *See* Fed. R. Evid. 403 advisory committee's note to 1972 amendment ("'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."). Because "[r]esearch has shown that a large portion of Americans believe that rap artists are more likely to write autobiographically than other artists and that they are more likely to engage in violence or be members of gangs," prosecutors who introduce rap music evidence "are also able to subtly introduce these misconceptions likely to be held by at least some jurors." McGlynn, at 8, *see also Stephenson*, 550 F. Supp. 3d at 1253 (concluding "lyrics and depictions of Defendant [handling a large amount of cash and in possession of various firearms] create a significant risk that the jury will view him as a violent

drug dealer and gang member and find him guilty of the charged offenses for improper reasons").

The unfair prejudice included the very real danger of evoking racial prejudice. Studies show that racial prejudice is triggered by exposing jurors to videos of defendants engaging in rap music. *See* Peter J. Rentfrow & Samuel D. Gosling, The Content and Validity of Music-Genre Stereotypes Among College Students, 35 Psych. of Music 306, 315-18 (2007); Amy Binder, Constructing a Racial Rhetoric: Media Depictions of Harm in Heavy Metal and Rap Music, 58 Am. Soc. Rev. 753, 765-66 (1993); *see also* Stuart P. Fischoff, Gangsta' Rap and a Murder in Bakersfield, 29 J. Applied Soc. Psych. 795, 803 (1999); James D. Johnson, Sophie Trawalter & John F. Dovidio, Converging Interracial Consequences of Exposure to Violent Rap Music on Stereotypical Attributions of Blacks, 36 J. Experimental Soc. Psych. 233, 245-47 (2000).

It is likely that the rap video evidence in this case elicited similar racially charged emotions based on inaccurate and unfair stereotypes due to the composition of the jury. In *United States v. Williams*, No. 20-13352, 2022 U.S. App. LEXIS 14472 (11th Cir. 2022)(unpublished), a defendant argued that rap videos introduced at his trial "had an unduly prejudicial effect because they were played for an 'all-white jury' that was likely to 'misunderstand the cultural

36

underpinnings of rap music.'" *Id.* at \*6. However, the defendant "cite[d] to nothing in the record demonstrating the racial make-up of the jury and no evidence demonstrating the jurors' appreciation of or experience (or lack thereof) with rap music." *Id.* Here, in contrast, it was learned before trial that only two members of the jury, both women, were black, and that no member of Mr. Jones's jury regularly listened to rap or hip hop music. Doc. 110 at 60, 88, 93, 94, 102.

The music video evidence was also cumulative. *See United States v. Jernigan*, 341 F.3d 1273, 1282 (11th Cir. 2003)(Rule 403 "calls for a common sense assessment of all the circumstances surrounding the extrinsic offense, including prosecutorial need, overall similarity between the extrinsic act and the charged offense, as well as temporal remoteness"). At trial, the government introduced numerous exhibits not extracted from music videos that showed Mr. Jones talking about or handling drugs, guns, and cash, and the two guns charged in the superseding indictment were found in Mr. Jones's bedroom with his DNA on them. Yet the government chose to introduce so many music video images that it became a "feature of the trial" that overshadowed other evidence due to its inflammatory nature. *Stephenson*, 550 F.Supp.3d at 1253; *see also Gamory*, 635 F.3d at 493 (rap video was inadmissible, in part, because it was introduced at the end of the case and was cumulative of other evidence already presented).

Finally, permitting the prosecution to introduce artistic expression evidence as evidence in Mr. Jones's trial violated the spirit of the First Amendment. *See* McGlynn, at 6 ("Rap's political origins and creative conventions place it at the heart of First Amendment considerations."). Global culture and artistic expression suffer when the government is permitted to chill free expression by admitting artistic expression evidence in criminal trials. *See generally New York Times v. Sullivan*, 376 U.S. 254, 279 (1964)(a rule that "dampens the vigor and limits the variety of public debate . . . is inconsistent with the First and Fourteenth Amendments.").

Admission of the rap music video evidence was an abuse of discretion that was not harmless. *See Gamory*, 635 F.3d at 492 ("Where a District Court abuses its discretion in admitting evidence, we may still find the error harmless."). "Non-constitutional error is harmless when it does not affect the substantial rights of the parties." *Id.* (citations omitted). "Under this standard, to find non-constitutional error harmless," the Court "must be able to say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). "The burden is on the government to show that the error did not affect the defendant's substantial rights." *Id.* (citations omitted). Here, the government

38

cannot meet this burden. While Mr. Jones confessed to possessing the Glock 22 in his closing argument at trial (Doc. 113 at 549), he denied possessing the Glock 23 and possessing either Glock in furtherance of the drug offenses charged in counts one and two. Doc. 113 at 549-554. The drugs charged in counts one and two were not found in Mr. Jones's home or on his person. They were found in a car parked in a communal parking lot that was around 60 to 80 feet from the apartment building, and the car was not shown at trial to belong to or to be used by Mr. Jones. The evidence that Mr. Jones possessed the charged guns in furtherance of the drug offenses was especially weak. The guns were not found in proximity to any distribution quantity of drugs and were not otherwise shown to be possessed in furtherance of the drug offenses. These gaps in the government's trial evidence make it highly likely the rap music video evidence substantially swayed the jury's verdict.

## III. The government violated Mr. Jones's Fifth Amendment rights and tainted the convictions when the prosecutor and a government law enforcement witness commented on Mr. Jones's post-*Miranda* silence in front of the jury during the government's case in chief.

During trial, a prosecutor may not comment on a defendant's post-*Miranda* silence or his post-*Miranda* invocation of the right to counsel. *Doyle v. Ohio*, 426 U.S. 610, 617-19 (1976)("[I]t would be fundamentally unfair to allow an arrestee's silence to be used to impeach an explanation subsequently given at trial

39

after he had been impliedly assured, by the *Miranda* warnings, that silence would carry no penalty."); *Wainwright v. Greenfield*, 474 U.S. 284, 295 & n.13 (1986)(holding that the use of post-*Miranda* silence during prosecution's case in chief to defeat insanity defense was fundamentally unfair and a violation of the defendant's right to due process; post-*Miranda* "silence" "includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted"). This is because such comments can be seen as penalizing the defendant for exercising the right to remain silent, which is guaranteed after *Miranda* warnings are issued. 426 U.S. at 618.

This Court has specifically noted that any comment on a defendant's silence, whether direct or indirect, that occurs during the government's case in chief will be scrutinized "with great care." *United States v. Miller*, 255 F.3d 1282, 1285 (11th Cir. 2001)("We have not hesitated to reverse a conviction which was tainted by such an improper comment on the defendant's silence at arrest. And yet, prosecutors continue to indulge themselves in this way. It is a practice which should end and which we shall continue to scrutinize with great care."); *see also Greer v. Miller*, 483 U.S. 756, 765 (1987)(observing that even an attempted violation of "the rule of *Doyle* by asking an improper question in the presence of the jury" is prosecutorial misconduct that could rise to the level of a due process violation); *United States v. Edwards*, 576 F.2d 1152, 1154 (5th Cir. 1978)("Such

comments may constitute plain error, and a judge's cautionary instruction will not suffice to cure the error." (Citations omitted)).[11]

This Court has found *Doyle* error harmless beyond a reasonable doubt "where the violation consisted of only a single reference to the defendant's post-*Miranda* silence during the course of a trial at which the government's evidence was otherwise overwhelming." *Hill v. Turpin*, 135 F.3d 1411, 1417-18 (11th Cir. 1998)(collecting cases); *see also Miller*, 255 F.3d at 1285 ("A *Doyle* violation is harmless if the error had no substantial and injurious effect or influence in determining the jury's verdict."). "In so holding," the Court has often "emphasized both that the improper reference was 'isolated' or 'unintentional' or promptly addressed by a curative instruction from the trial court, and that the prosecutor made no effort to further 'highlight' the defendant's exercise of *Miranda* rights either in questioning other witnesses or during closing argument." *Hill*, 135 F.3d at 1417-18 (collecting cases). This Court has "declined to find *Doyle* error harmless in those cases where the prosecutor returned repeatedly to the defendant's post-*Miranda* silence throughout trial to impeach a plausible exculpatory story offered by the defendant." *Id.* (collecting cases). "Moreover, this court has recognized that even a single improper reference might not be

_____

[11] *See also Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc)(adopting as precedent all decisions of the former Fifth Circuit).

harmless under the *Chapman* [harmless-beyond-a-reasonable-doubt] standard where the defendant's exculpatory story—on which the prosecution's comment cast doubt—was not implausible, the government's evidence was not overwhelming, and the reference was purposeful." *Id.* (collecting cases).

Here, the government both elicited testimony about the defendant's post-*Miranda* silence and directly inquired about it during its direct examination of Corporal Hunter. First, the prosecutor asked an open-ended question that led Hunter to comment on Mr. Jones's post-*Miranda* invocation of his right to counsel. Doc. 111 at 216. A few minutes later, the prosecutor doubled-down on the error by directly asking Hunter if Mr. Jones "invoked his rights" when Hunter attempted to interview him after giving the *Miranda* warning. *Id.* at 219-220 ("And, additionally, in speaking about Hassan Jones, you said that you attempted to interview him but he invoked his – or after Mirandizing him, he invoked his rights, correct?").

Under the plain error standard, the defendant must show an error that was plain and affected the defendant's substantial rights. *United States v. Olano*, 507 U.S. 725, 732-36 (1993). When these factors are met, this Court may exercise its discretion and correct the error if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 736. Because the Supreme Court

and Circuit precedents cited above clearly prohibit a prosecutor from commenting on a defendant's post-*Miranda* silence, the first two prongs of the plain error standard are satisfied. *See United States v. Dortch*, 696 F.3d 1104, 1114 (11th Cir. 2012)(plain error is error that is "obvious" and "clear under current law"). The error was not harmless beyond a reasonable doubt because it was not an unintentional, isolated incident, and the evidence was not overwhelming on every count of the indictment, particularly, as argued above, on count three. Corporal Hunter's comment on Mr. Jones's post-*Miranda* silence served no purpose other than to suggest to the jury that he had to get a search warrant to obtain Mr. Jones's DNA because Mr. Jones would not volunteer the sample or otherwise cooperate. The prosecutor boldly brought the matter up again right after she asked Corporal Hunter a question about the Glock 23 retrieved from the closet of the bedroom. Doc. 111 at 219-220. The only possible reason for the prosecutor to ask about post-*Miranda* silence at that point in the trial was to insinuate to the jury that Mr. Jones had an opportunity to disclaim ownership of the Glock 23 at the time of his arrest and did not do so. Importantly, while Mr. Jones confessed to possessing the Glock 22 in his closing argument at trial (Doc. 113 at 549), he denied possessing the Glock 23 and denied possessing either Glock in furtherance of the drug offenses charged in counts one and two. Doc. 113 at 549-554. As argued above in Issue I, the evidence that Mr. Jones

43

possessed the charged guns in furtherance of the drug offenses was not strong.

The guns were not found in proximity to any distribution quantity of drugs and

were not otherwise shown to be possessed in furtherance of the drug offenses.

Finally, regarding the final prong of the plain error standard, comments by

trained and experienced prosecutors and law enforcement witnesses on a

defendant's post-*Miranda* silence should never happen in the presence of a jury

during a trial. This is precisely the sort of constitutional error that is likely to

impugn the fairness, integrity, and public reputation of the judicial proceedings.

The *Doyle* rule exists precisely because it is fundamentally unfair to tell a

defendant that he has a right to remain silent and then use that same silence

against him at trial. *Doyle,* 426 U.S. at 618. It is also prosecutorial misconduct.

*Greer*, 483 U.S. at 765.

## IV. The prosecutor improperly quoted and relied on an exhibit that was not admitted in evidence during the government's closing argument.

The importance of closing argument in criminal trials cannot be overstated.

"[C]losing argument serves to sharpen and clarify the issues for resolution by the

trier of fact." *Herring v. New York*, 422 U.S. 853, 862 (1975). For the first time, the

parties are "in a position to present their respective versions of the case as a

whole," "argue the inferences to be drawn from all the testimony," and "point

out the weaknesses of their adversaries' positions." *Id.* However, the parties must

44

be careful not to mis-state the evidence. This is especially true for the government, which has the burden of proof. A prosecutor "may not exceed the evidence presented at trial during her closing argument." *United States v. Reeves*, 742 F.3d 487, 505 (11th Cir. 2014)("The purpose of closing argument is to assist the jury in analyzing the evidence, *and although a prosecutor may not exceed the evidence presented at trial during her closing argument*, she may state conclusions drawn from the trial evidence."(emphasis added)).

In ascertaining whether a prosecutor's improper remarks during closing argument constitute misconduct that warrants reversal of the conviction, the remarks "must be viewed in the context of the trial as a whole." *Reeves*, 742 F.3d at 505. The prosecutor "is entitled to make a fair response to the arguments of defense counsel." *Id.* (citation omitted). When evaluating whether a defendant's substantial rights were affected, the Court will "'generally consider four factors: (1) whether the challenged comments had a tendency to mislead the jury or prejudice the defendant; (2) whether the comments were isolated or extensive; (3) whether the comments were deliberately or accidentally placed before the jury; and (4) the strength of the competent proof establishing the guilt of the defendant.'" *Id.* (citation omitted).

In this case, in her closing argument, the prosecutor quoted from a

government exhibit that was not admitted into evidence during the trial. Doc.

85-4 (government exhibit list). The prosecutor said:

> Take a look at Government's Exhibit 19Z. Messages from the
> defendant's Instagram. What are these about? We got 1,700 apiece.
> I brought weed with my money and told you I would have eff with
> after I sold it and you. Right? What's the defendant respond? I'm
> through talking. I'm going to smoke you if you don't have my
> money.

Doc. 113 at 541-42. The prosecutor then characterized Exhibit 19Z as "[a]ll you

need to know about the defendant's possession of firearms in furtherance of

drug dealing in one message." *Id.* at 542. This occurred during the government's

initial closing argument, not during its rebuttal argument.

Quoting an exhibit not in evidence is "plain error" under the Circuit

precedents cited above. *See Dortch*, 696 F.3d at 1114 (plain error is error that is

"obvious" and "clear under current law"). It is also extremely prejudicial in this

case because the alleged statement of Mr. Jones in Exhibit 19Z is a violent

statement that also significantly strengthened the government's argument that

Mr. Jones possessed guns in furtherance of drug dealing in support of the charge

in Count Three. The statement, "I'm through talking. I'm going to smoke you if

you don't have my money," in the context of a conversation about drug sales

goes directly to the elements of the § 924(c) charge. The prosecutor affirmed the

importance of Exhibit 19Z to its case on Count Three when she characterized

46

the exhibit as "[a]ll you need to know about the defendant's possession of firearms in furtherance of drug dealing in one message." Doc. 113 at 542. As argued above in Issue I, the evidence the government admitted on Count Three was not strong because the charged firearms were not found in proximity to a distribution quantity of drugs and were not otherwise shown to be possessed in furtherance of the drug offenses. Finally, as with the comments on post-*Miranda* silence argued in Issue III, this is the sort of obvious error that is likely to impugn the fairness, integrity, and public reputation of the judicial proceedings. "In general, an attorney may not inject into his argument any extrinsic or prejudicial matter that has no basis in the evidence . . . The primary reason for restraining a prosecutor and demanding a high standard of care is that, due to his position as a public official, his allusion to extrinsic evidence and interjection of his own opinion may be given undue weight by the jurors." *United States v. Herberman*, 583 F.2d 222, 230 (5ᵗʰ Cir. 1978)(citation omitted); *Bonner v. City of Prichard*, 661 F.2d at 1209.

## V. The cumulative effect of the trial errors affected Mr. Jones's substantial rights and deprived him of a fair trial.

In this appeal, Mr. Jones has raised three trial errors that individually affected his substantial rights. Under the cumulative error doctrine, an aggregation of non-reversible errors can affect whether a defendant received a fundamentally

47

fair trial. *United States v. Ladson*, 643 F.3d 1335, 1342 (11th Cir. 2011); *United States v. Hands*, 184 F.3d 1322 (11th Cir. 1999). In evaluating Mr. Jones's claim, this Court must examine the entire trial to determine whether it was fundamentally fair, and reverse if the combined errors affected his substantial rights. *Ladson*, 643 F.3d at 1342. The individual errors here were not harmless, but even assuming they were, the combined effect of the errors severely prejudiced Mr. Jones, affecting his substantial rights and denying him a fair trial. *See United States v. Baker*, 432 F.3d 1189, 1203 (11th Cir. 2005)("[T]he cumulative prejudicial effect of many errors may be greater than the sum of the prejudice caused by each individual error."); *Herberman*, 583 F.2d at 231 ("Even though any single instance [of prosecutorial misconduct] might not have resulted in a reversal, we are convinced that the sum of all these errors prevented appellant from obtaining a fair and impartial trial. The prosecution made too many improper suggestions, introduced too much improper evidence and denied the existence of evidence on too many occasions. What inferences were planted in the minds of the jurors we cannot determine. We hold, however, that their verdict could not have been based solely upon proper consideration of relevant and admissible evidence.").

## CONCLUSION

For the reasons stated, Mr. Jones's conviction on count three must be reversed and rendered because insufficient evidence supports it. His convictions on all counts should be vacated and the case remanded for a new trial due to the individual and combined impact of multiple trial errors that deprived him of a fair trial.

s/Kristen Gartman Rogers
Assistant Federal Defender
Southern District of Alabama
Federal Defenders Org., Inc.
11 North Water Street, Suite 11290
Mobile, Alabama  36602
(251)433-0910

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2024, I electronically filed this brief with the Court and electronically served a copy of the brief on counsel of record for the Plaintiff-Appellee. On the same date, I have forwarded 4 copies of the brief to the Court by dispatch to Federal Express, a third party commercial carrier, for next day delivery.

s/Kristen Gartman Rogers
Assistant Federal Defender
Southern District of Alabama

49

Federal Defenders Org., Inc.

11 North Water Street, Suite 11290

Mobile, Alabama  36602

(251)433-0910

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 11,693 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally-spaced Garamond 14-point font.

s/Kristen Gartman Rogers

Assistant Federal Defender

Southern District of Alabama

Federal Defenders Organization

11 North Water Street, Ste 11290

Mobile, AL  36602

(251) 433-0910

Kristen_Rogers@fd.org